Linda Lye (CA SBN 215584)
llye@aclunc.org
Matthew T. Cagle (CA SBN 286101)
mcagle@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 621-2493
Fax: (415) 255-8437

Patrick Toomey (admitted *pro hac vice*)
ptoomey@aclu.org
Anna Diakun (admitted *pro hac vice*)
adiakun@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500
Fax: (212) 549-2654

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO-OAKLAND DIVISION

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA; AMERICAN CIVIL LIBERTIES UNION; AMERICNA CIVIL LIBERTIES UNION FOUNDATION,<br><br>Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF JUSTICE,<br><br>Defendant. | Case No. 4:17-cv-03571 JSW<br><br>DECLARATION OF MATTHEW CAGLE IN SUPPORT OF PLAINTIFFS' REPLY<br><br>Hearing Date: November 17, 2017<br>Time:          9:00 a.m.<br>Location:      Oakland U.S. Courthouse<br>Judge:         Hon. Jeffrey S. White |

**I, Matthew Cagle, declare as follows:**

1.      My name is Matthew Cagle. I am counsel for Plaintiffs in the above-referenced action. The information in this declaration is based upon my personal knowledge and if called upon to testify, I could and would competently testify thereto.

2.      I submit this declaration in support of Plaintiffs' Reply to Defendant's Opposition to Plaintiff's Cross-Motion for Summary Judgment.

3.      I am an attorney with the ACLU Foundation of Northern California. In my capacity as an attorney, I work on issues pertaining to, among other things, privacy, technology, and electronic surveillance.

4.      Attached hereto as Exhibit 1 is a true and correct copy of the *Organization, Mission And Functions Manual: Criminal Division*, Department of Justice ("DOJ"), which I obtained from the following website: https://www.justice.gov/jmd/organization-mission-and-functions-manual-criminal-division.

5.      Attached hereto as Exhibit 2 is a true and correct copy of a letter marked November 5, 2015 and sent from DOJ, via its component National Security Division ("NSD"), to Plaintiff American Civil Liberties Union providing an update on processing of a FOIA request, stating that the Department of the Treasury had located records and referred them to NSD for processing, and including a schedule of those records.

6.      Attached hereto as Exhibit 3 is a true and correct copy of the relevant pages from Charlie Savage, *Power Wars*, 586-93 (2015).

7.      Attached as Exhibit 4 is a true and correct copy of the *Mission*, DOJ, which I obtained from the following website: https://www.justice.gov/olp.

8.      Attached as Exhibit 5 is a true and correct copy of the relevant pages of *Additional Prehearing Questions for John Carlin Upon His Nomination to be Assistant Attorney General for National Security Department of Justice*, which I obtained from the following website: https://fas.org/irp/congress/2014_hr/022514carlin-preh.pdf.

DECL. OF MATTHEW CAGLE
*ACLU of N.Cal. et al. v. DOJ*, Case No. 4:17-cv-03571 JSW
1

1    9.    Attached as Exhibit 6 is a true and correct copy of the relevant pages from the

2  Def's Reply to Pl.'s Opp. to Def's Mot. to Dismiss and for Summ. J., *American Immigration*

3  *Council v. DHS*, 1:11-cv-01971-JEB (D.D.C. Sept. 6, 2012), ECF. No. 20, which I obtained from

4  Pacer.

5    I declare under penalty of perjury under the laws of the United States that the foregoing is

6  true and correct.

7    Executed this 3rd day of November in San Francisco, California.

8

9    _____

10    Matthew Cagle

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  DECL. OF MATTHEW CAGLE
*ACLU of N.Cal. et al. v. DOJ*, Case No. 4:17-cv-03571 JSW
2

# EXHIBIT 1

# ORGANIZATION, MISSION AND FUNCTIONS MANUAL: CRIMINAL DIVISION



Approved by: _[signature]_     Date: Aug. 28, 2013

ERIC H. HOLDER, JR.
Attorney General

d

The Criminal Division was created by Attorney General Palmer in his reorganization of the Department of Justice in 1919.

The mission of the Criminal Division is to serve the public interest through the enforcement of criminal statutes in a vigorous, fair, and effective manner; and to exercise general supervision over the enforcement of all federal criminal laws, with the exception of those statutes specifically assigned to the Antitrust, Civil Rights, Environment and Natural Resources, or Tax Divisions.

The major functions of the Division are to:

- Develop, enforce, and supervise the application of all federal criminal laws, except those specifically assigned to other divisions of the Department.

- Supervise a wide range of criminal investigations and prosecutions, including international and national drug trafficking and money laundering organizations; international organized crime groups; corrupt public officials; human rights violators; domestic and international child exploitation enterprises; domestic and international hackers; and individuals and organizations responsible for financial fraud and misconduct.

- Approve and oversee the use of the most sophisticated investigative authorities in the federal arsenal, including reviewing all federal electronic surveillance requests in criminal cases and authorizing participation in the

Witness Security Program.

- Advise the Attorney General and other senior leadership within the Executive Branch on matters of criminal law.

- Coordinate with foreign countries to secure the return of fugitives and obtain evidence and other assistance from abroad, and assure that the United States meets its reciprocal obligations to treaty partners.

- Formulate and implement criminal enforcement policy and provide advice and assistance to all levels of the law enforcement community, including providing training to federal, state, and local prosecutors and investigative agencies.

- Provide training and development assistance to foreign criminal justice systems.

The Division's major responsibilities include:

- Public integrity – Identifying, investigating, and prosecuting corrupt government officials; providing expertise, guidance, and instruction to law enforcement agents and prosecutors on matters involving corruption; and ensuring that sensitive public corruption and election crime matters are handled in a uniform, consistent, and appropriate manner across the country.

- Human rights and special prosecutions – Investigating and prosecuting cases related to human rights violations, international violent crime, and complex immigration crimes; pursuing the U.S. Government's commitment to holding accountable human rights violators and war criminals, both as a domestic law enforcement imperative and as a contribution to the global effort to end impunity.

- Fraud - Investigating and prosecuting sophisticated and multi-district white-collar crimes including corporate, securities, and investment fraud, government program and procurement fraud, health care fraud, and international criminal violations including the bribery of foreign government officials in violation of the Foreign Corrupt Practices Act.

- Child exploitation - Prosecuting high-impact cases involving online child pornography, the online grooming and inducement of children by sexual predators, sex trafficking of children, travel abroad by U.S. citizens and residents to sexually abuse foreign children (sex tourism), and enforcement of sex offender registration laws; providing forensic assistance to federal prosecutors and law enforcement agents in investigating and prosecuting violations of federal criminal statutes criminalizing child exploitation; coordinating nationwide operations targeting child predators; and developing policy and legislative proposals related to these issues.

- Computer crime and intellectual property crime - Working to prevent and respond to criminal cyber attacks; improving the domestic and international laws to most effectively prosecute computer and IP criminals; and directing multi-district and transnational cyber investigations and prosecutions.

- Narcotics and dangerous drugs - Combating domestic and international drug trafficking and narco-terrorism; drawing on available intelligence to prosecute individuals and criminal organizations posing the most significant drug trafficking threat to the United States; enforcing laws that criminalize the extraterritorial manufacture or distribution of controlled substances intended for the United States; and facilitating the provision of targeted intelligence support to DEA and other law enforcement agencies worldwide.

- Organized crime – Overseeing the Department's program to combat organized crime by: investigating and prosecuting nationally and internationally significant organized crime organizations and gangs; exercising approval authority over all proposed federal prosecutions under the Racketeer Influenced and Corrupt Organizations (RICO) and Violent Crimes in Aid of Racketeering (VICAR) statutes; supporting criminal prosecutions of federal crimes involving labor-management disputes, the internal affairs of labor unions in the private sector, and the operation of employee pension and welfare benefit plans; working with U.S. intelligence agencies and U.S. and foreign law enforcement agencies to identify, target, and investigate transnational organized crime groups; and contributing to the development of policy and legislation relating to numerous organized crime-related issues, including gambling and human trafficking.

- Sensitive investigative techniques - Overseeing the use of the most sophisticated investigative tools at the Department's disposal; reviewing federal electronic and video surveillance requests; authorizing participation in the Federal Witness Security Program; and reviewing requests for witness immunity, transfers of prisoners to and from foreign countries to serve the remainder of their prison sentences, attorney and press subpoenas, applications for S-Visa status, and the imposition of special administrative measures to further restrict the confinement conditions of certain very dangerous persons in the custody of the Bureau of Prisons.

- International affairs - Making all requests for international extraditions and for foreign evidence on behalf of federal, state, and local prosecutors and investigators; satisfying foreign requests for fugitives and evidence located in the U.S.; negotiating and implementing law enforcement treaties; providing guidance to prosecutors and investigators on legal and policy issues arising in sensitive transnational investigations; and providing critical advice to the Attorney General and other principals of the Department on matters involving international law enforcement cooperation and comparative criminal law and practice.

- Assistance to foreign law enforcement institutions (police and corrections) -  Supporting the creation and development of new and existing police forces in other countries and international peacekeeping operations; enhancing the capabilities of existing police forces in emerging democracies; strengthening U.S. national security by assisting nations that are on the front lines of the war on terrorism, and creating sustainable foreign law enforcement institutions that promote democratic principles, instill respect for human rights and human dignity, and reduce the threat of transnational crime and terrorism.

- Policy and legislation - Serving as subject matter experts in all matters relating to criminal law and using that expertise to develop legislative and policy proposals to enhance our ability to fight crime; serving as the Department representative to the U.S. Sentencing Commission.

- Appeals - Drafting briefs and certiorari petitions for the Solicitor General for filing in the U.S. Supreme Court; making recommendations to the Solicitor General as to whether further review is warranted on adverse criminal decisions in the district courts and courts of appeals; and preparing briefs and arguing cases in the courts of appeals.

- Capital cases - Advising on factual and legal issues relevant to capital eligible cases and decisions to seek the death penalty; providing legal, procedural, and policy guidance and direct litigation support to United States Attorney's Offices handling capital investigations and prosecutions.

- Money laundering and asset recovery - Pursuing criminal prosecutions against financial institutions and individuals engaged in money laundering, Bank Secrecy Act, and sanctions violations; pursuing the proceeds of high level foreign corruption through the Kleptocracy Asset Recovery Initiative; developing legislative, regulatory, and policy initiatives to combat global illicit finance; returning forfeited criminal proceeds to benefit those harmed by crime through remission and restoration processes; and providing legal and policy assistance and training to federal, state, and local prosecutors and law enforcement personnel, as well as to foreign governments.

Return to the table of contents

*Updated September 2, 2016*

---

Was this page helpful?
Yes    No

# EXHIBIT 2



**U.S. Department of Justice**

National Security Division

_____
_Washington, D.C.  20530_

NSD FOI/PA #15-213

Mr. Patrick Toomey
National Security Project
American Civil Liberties Union                    **NOV 0 5 2015**
125 Broad Street, 18th Floor
New York, NY   10004

Dear Mr. Toomey:

While processing your December 19, 2014, Freedom of Information Act (FOIA) request, the Department of the Treasury (DOT) located records and referred them to the National Security Division (NSD) of the Department of Justice for processing.  NSD received this referral on September 9, 2015.

We have reviewed these records and have determined to withhold the records  (as described on the enclosed schedule) in full pursuant to one or more of the following FOIA exemptions set forth in 5 U.S.C. 552(b):

(5) which permits the withholding of inter-agency or intra-agency memorandums or letters which reflect the predecisional, deliberative processes of the Department; and/or which consists of attorney work product prepared in anticipation of litigation;

(6) which permits the withholding of personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy; and,

(7) which permits the withholding of records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ...

(C) could reasonably be expected to constitute an unwarranted invasion of personal privacy.

Many of the records referred to NSD originated with other components.  Therefore, we have referred records to the Office of Information Policy, the Office of Legal Counsel, and the Civil Division for review and direct response to you.

If you are not satisfied with this response, you may file an administrative appeal by writing to the Director, Office of Information Policy, United States Department of Justice, 1425 New York Avenue, N.W., Suite 11050, Washington, D.C. 20530-0001, or you may submit an

appeal through OIP's eFOIA portal at: http://www.justice.gov/oip/efoia-portal.html.  Your appeal must be postmarked or transmitted electronically within sixty days of the date of this letter.  Both the letter and envelope should be clearly marked, "Freedom of Information Act Appeal."

Sincerely,

Kevin Tiernan
Records and FOIA Unit Chief

2

**SCHEDULE OF DOCUMENTS WITHHELD IN FULL**
**(Refer to Body of Letter for Full Description of Each Exemption)**

1. Draft Memorandum undated to All Federal Prosecutors; 33 pages.
   Withheld in full pursuant to 5 U.S.C. 552(b)(5).

2. Draft Memoranda 6/8/2014 NSD Attorneys to Brad Wiegmann, Deputy Assistant Attorney
   General, NSD; 11 pages with drafts dated 6/12/2014; 12 pages (four copies).
   Withheld in full pursuant to 5 U.S.C.552(b)(5).
   Withheld in part pursuant to 5 U.S.C. 552(b)(6) and (7)(C).

3. Draft Frequently Asked Questions concerning Counterterrorism and Counterespionage
   Investigations and FISA 8/19/2004; 23 pages.
   Withheld in full pursuant to 5 U.S.C.552(b)(5).
   Withheld in part pursuant to 5 U.S.C. 552(b)(6) and (7)(C).

4. Guidance on the Use of Discovery of Information Obtained Pursuant to the Foreign
   Intelligence Surveillance Act of 1978 in National Security Investigations and Cases 6/3/2005;
   23 pages.
   Withheld in full pursuant to 5 U.S.C.552(b)(5).
   Withheld in part pursuant to 5 U.S.C. 552(b)(6) and (7)(C).

5. Memorandum 1/16/2009 J. Patrick Rowan, Assistant Attorney General, NSD to the Office of
   Foreign Assets Control Attorney, DOT; 5 pages with form; 2 pages.
   Withheld in full pursuant to 5 U.S.C. 552(b)(5).

# EXHIBIT 3

Also by Charlie Savage

*Takeover: The Return of the Imperial Presidency
and the Subversion of American Democracy*

# POWER WARS

INSIDE OBAMA'S POST-9/11 PRESIDENCY

## CHARLIE SAVAGE

Little, Brown and Company
New York   Boston   London

Copyright © 2015 by Charlie Savage

All rights reserved. In accordance with the U.S. Copyright Act of 1976, the scanning, uploading, and electronic sharing of any part of this book without the permission of the publisher constitute unlawful piracy and theft of the author's intellectual property. If you would like to use material from the book (other than for review purposes), prior written permission must be obtained by contacting the publisher at permissions@hbgusa.com. Thank you for your support of the author's rights.

Little, Brown and Company
Hachette Book Group
1290 Avenue of the Americas, New York, NY 10104
littlebrown.com

First Edition: November 2015

Little, Brown and Company is a division of Hachette Book Group, Inc. The Little, Brown name and logo are trademarks of Hachette Book Group, Inc.

The publisher is not responsible for websites (or their content) that are not owned by the publisher.

The Hachette Speakers Bureau provides a wide range of authors for speaking events. To find out more, go to hachettespeakersbureau.com or call (866) 376-6591.

ISBN 978-0-316-28657-2

LCCN 2015942263

10 9 8 7 6 5 4 3 2 1

RRD-C

Printed in the United States of America

*For my sons, William and Peter*

At a Senate Judiciary Committee hearing on the last day of July, senators from both parties sharply challenged intelligence officials' claims about the value of the program. While Feinstein, the Intelligence Committee chairwoman, defended the phone program, saying it helped prevent terrorist attacks, Leahy, the Judiciary Committee chairman, growled, "If this program is not effective it has to end. So far, I'm not convinced by what I've seen."[59]

Some administration officials were also unconvinced. In August 2013, during a principals committee meeting, Holder spoke up with a note of skepticism. He and his deputy, James Cole, were both vacationing on Martha's Vineyard, and they crammed into a trailer where the Justice Department had set up a mobile command center with a secure communications link. There was only one camera, so they had to sit awkwardly close to each other staring into it, both of them shivering in short sleeves in the overly air-conditioned room for the hours-long meeting—an odd scene for those in the Situation Room watching them on the screen. Holder said that while he understood the theory of why the program might be useful, when you looked at what it had done in practice, there did not seem to be much there.

*Is the section 215 program really something the administration should be defending?* Holder asked. *Is this really worth it?*

But Denis McDonough, Obama's White House chief of staff, rebuked him with a clipped, excessively formal inquiry.

*Is the attorney general of the United States saying 215 is not worth defending?*

Holder immediately backed off.

*I'm not going that far,* he said. *Just raising the question.*

### 8. Evidence Derived from Warrantless Surveillance

The attention to surveillance issues that followed the Snowden leaks also led to a major internal Justice Department fight. It traced back to 2012, when Verrilli had made his assurances to the Supreme Court in

the case challenging the FISA Amendments Act and Dianne Feinstein had delivered her Senate floor speech urging her colleagues to reauthorize that law.

On June 7, 2013, two days into the tumult caused by the Snowden leaks, two colleagues and I cowrote a front-page story for the *Times* about how surveillance had been used. My contribution was a section about the terrorism cases Feinstein had cited in her speech. The section also pointed out that Verrilli had promised the Supreme Court that criminal defendants would be notified if evidence derived from warrantless surveillance under that law was used against them, but prosecutors in the South Florida and Chicago cases mentioned by Feinstein were refusing to do that. I quoted Alexander Abdo of the American Civil Liberties Union accusing the government of playing a shell game. "It's a strategy meant to insulate the 2008 law from judicial review, and thus far the strategy that has succeeded," he said.[60]

Among that article's readers was Verrilli.[61] He called up the National Security Division lawyers who had vetted his briefs and helped him practice his oral arguments. They had known that he intended to tell the court the Justice Department would provide notice of warrantless surveillance to defendants, and they had raised no objections. Verrilli convened a meeting with those lawyers and Brad Wiegmann, the number-two official in the division, and asked what was going on.

The national security prosecutors explained that their division had long used a narrower definition of what *derived from* means for FISA wiretaps than for ordinary criminal-law wiretaps. In ordinary criminal cases, defendants eventually see almost everything, including the original application to a magistrate for the wiretap, which contains the evidence that justified the privacy intrusion. By contrast, in national security cases, prosecutors will tell defendants if there is evidence from a FISA order, but they say nothing about what information went into the application for it—or even if there was more than one such order. That permits defendants to challenge the constitutionality of FISA procedures in the abstract without the government having to risk their revealing sensitive intelligence—like the identity of someone else who

is under surveillance as a spy or terrorist. (No challenge to the traditional FISA procedures had succeeded, although the Supreme Court has never reviewed the statute.)

The Justice Department, however, had developed that policy when there was only one kind of FISA wiretap. Starting in 2007, there were two kinds—one with warrants, and one without them. But, without telling anyone what its system was, the division had not changed its practice or made it clear to outsiders. This had the effect of concealing something very important. Sometimes, the warrantless surveillance program, while targeting a foreigner, intercepted communications from an American writing to or about that target. The Justice Department then submitted those intercepts to the FISA Court as evidence to justify a traditional wiretap order against the American. Then it prosecuted that American on the basis of evidence gathered with the traditional wiretap order. Such a criminal defendant might want to ask a judge to suppress that evidence, and because the investigative chain traced back to the FISA Amendments Act warrantless program, that gave him legal standing to challenge its constitutionality. But nobody had filed such a challenge because *nobody knew he was in a position to do so.* The Justice Department's practice hid that fact from such criminal defendants, effectively shielding the 2008 law from judicial review.

The division lawyers argued to Verrilli that it was just a good-faith misunderstanding about what *derived from* meant. But their narrow interpretation clashed with what *derived from* means in ordinary criminal wiretap case law, and it raised a question of whether prosecutors had violated defendants' rights to due process and its obligation to provide helpful information to the defense. Verrilli's concerns now grew beyond whether the division had induced him to mislead the Supreme Court. He told colleagues that the division's practice looked illegal. He sought a meeting with John Carlin, the acting head of the division, who Obama later appointed as its permanent chief.

Carlin had not been involved in preparing Verrilli and was not previously acquainted with the issue. But he raised operational concerns about changing the practice: if the Justice Department told defendants

they had been overheard due to the 2008 law, that might tip off their contacts abroad, who were presumably still at large, that their communications were being targeted for surveillance. As a result, the NSA might become reluctant to share information with law enforcement officials, rebuilding a form of the "Wall" between intelligence investigators and criminal investigators, which the government had torn down after 9/11.*

The National Security Division retreated to study the issue. Carlin called his predecessors, including Lisa Monaco, Todd Hinnen, and David Kris, along with previous intelligence oversight lawyers who had dealt with the FISA Court, like John Demers and Matt Olsen. He asked if they had addressed the issue and if there was any thought-out reason for the division's notification practice. They came up with nothing substantial.

Meanwhile, around July 8, Carlin's staff developed and circulated an initial memo analyzing the issue of what *derived from* might mean and setting out various courses of action. It has not been made public, and the Justice Department, citing attorney-client privilege, refused to turn it over in response to a Freedom of Information Act lawsuit filed by the American Civil Liberties Union.[42] I was told it broke down four options: (1) sticking with the status quo policy; (2) changing to a generic notice that would say there was FISA information in the case without saying which of the two types it was; (3) changing to a notice that would specifically say if there was either kind; and (4) asking Congress to change the notice law.

Inside the National Security Division, there were different factions supporting different options. The main focus was on consequences. What other cases would be affected if they changed their practices? Would they have to brief Congress about it? As the days passed and Carlin produced no answer, Verrilli asked Cole, the deputy attorney general, to resolve the dispute. Cole scheduled an interagency meeting for July 17.

About a week before the meeting, Verrilli's staff produced an internal

---

* See chapter 5, section 7.

paper arguing that the Justice Department *must* change to the third option: providing specific notice about either and both types of surveillance. Meanwhile, Adam Liptak, my colleague at the *Times* who covers the Supreme Court, began calling the Justice Department. He wrote a legal affairs column every two weeks, and he had decided to devote the next one to the disconnect between what Verrilli had told the justices and what the Justice Department was actually doing. The *Times* would publish the column by the time of Cole's meeting.[63] Margaret Richardson, Holder's chief of staff, proposed making the change Verrilli was seeking without waiting for the meeting so they could tell Liptak that the problem was resolved. But Carlin's staff now circulated a paper arguing for keeping the status quo position—refusing to tell a defendant if warrantless surveillance lurked somewhere up the chain of evidence. That meant there was no consensus, and so the process would have to play out with full deliberations.

Over the final weekend, there were multiple conference calls and back-channel conversations. National Security Division lawyers reached out to the top lawyers at related agencies, like Andrew Weissmann at the FBI, Rajesh De at the NSA, and Bob Litt at the Office of the Director of National Intelligence, lobbying them to take their side. They also reached out to several important United States attorneys. One was Loretta Lynch, the top prosecutor in the Eastern District of New York, who was chairwoman of a committee of federal prosecutors that advised Holder. (She would succeed him as attorney general.) Another was Neil MacBride of the Eastern District of Virginia, who chaired the terrorism and national security subcommittee of the advisory committee. Others included Steven Dettelbach of the Northern District of Ohio and Barbara McQuade of the Eastern District of Michigan, who oversaw the prosecution of the Christmas 2009 underwear bomber. In these calls, the division lawyers argued that it was a policy call, not a legal call like the solicitor general's office was saying. The Justice Department as an institution, they claimed, thought the existing practice was best.

Some of the recipients of that message were more open to it than others. In particular, the U.S. attorneys were persuaded that there was no

need to change the notification policy, and there were real operational downsides to that idea. But the Washington-based security agency lawyers saw things differently. They thought that the arguments for the status quo policy were thin and unpersuasive as a legal matter.

Early the next week, Carlin changed his position. He produced a memo saying that the division no longer supported the status quo notice policy. The division now supported shifting to a generic notice in which prosecutors would tell defendants that evidence in their case came from FISA surveillance but without saying which type. However, his e-mail may not have been copied to the U.S. attorneys, who apparently remained unaware of it. Shortly before the meeting, the U.S. attorneys produced a memo of their own, in the name of MacBride's subcommittee but not signed by anyone. Awkwardly, it endorsed the status quo position that the National Security Division had just abandoned.

The meeting convened in the conference room adjacent to Cole's office, with the U.S. attorneys participating by speakerphone. The first question Cole asked, I was told by multiple participants, was addressed to Carlin:

*Isn't it true that the division knew what Don was going to tell the Supreme Court?*

One of the arguments some National Security Division lawyers had apparently been making in the weekend lobbying campaign was that Verrilli had blurted out the wrong thing to the Supreme Court on his own and without clearance, and was now trying to make his own problem into a problem for the department. But Carlin acknowledged that division staffers had known what Verrilli was going to say in arguments and had reviewed his written brief saying the same thing.

Cole then went around the room soliciting everyone's view. McQuade took the lead for the U.S. attorneys. She spoke forcefully about the worry that the NSA would not share important intelligence with criminal investigators and prosecutors if it had to provide more fulsome notice to defendants. And she said the U.S. attorneys were backing the National Security Division's position that the status quo was fine, which led to confusion since Carlin had abandoned that position.

Everyone else agreed there were operational downsides to changing the practice too. But that wasn't the primary question.

*Do any of you think this is lawful?* Verrilli asked.

There was silence. With no legal argument offered by the other side, the three lawyers representing the intelligence community—Weissmann, Litt, and a senior NSA lawyer Raj De had sent in his place because he was out of town—all backed Verrilli's view, and Carlin acquiesced to providing notice about both kinds of FISA surveillance.

*We're going to make the disclosure,* Cole said.

That left the problem of what to do about existing cases. Cole directed the National Security Division to go through its files, starting with still pending cases. That fall, the department belatedly notified two defendants that they faced evidence derived from FISA Amendments Act surveillance: a Colorado man charged with planning to travel to Uzbekistan to join an Islamist group[64] and an Oregon man caught in an FBI sting operation who had been convicted, but not yet sentenced, for trying to bomb a Christmas tree–lighting ceremony in Portland.[65]

There were surprisingly few other notifications, and the department was evasive about how it was interpreting its obligations under the new policy. Cole's policy decision—which apparently nobody ever wrote down, foiling the later attempt by the American Civil Liberties Union to make it public with a Freedom of Information Act lawsuit—was that not every case that involved warrantless surveillance information would qualify for disclosure. The use of that information, in an indictment or as evidence, had to have been *material* or a *critical element* in the eyes of the National Security Division prosecutors.

But it would take just one case for the Supreme Court to have a chance to review the law on the merits, which was the real point.

The defendants who did receive notice filed challenges, finally beginning judicial review of the FISA Amendments Act before the regular court system. The district court judge who had presided over the Oregon man's trial swiftly upheld the law and sentenced him to serve thirty years in prison, but it seemed likely that the Supreme Court would have the final say.[66]

In a twist, even after the policy shift, prosecutors in the Chicago and South Florida cases Feinstein mentioned in her Senate speech said those defendants were *still* owed no notification that they faced evidence derived from warrantless surveillance. A Senate lawyer sent a letter saying Feinstein's remarks had been misinterpreted.[67] She had just been reading down a *generic* list of terrorism cases, he said. The best spin on this was Feinstein had meant only to make the argument that terrorism remained a big problem, but inarticulately created a false impression that the FISA Amendments Act, specifically, had uncovered those terrorism suspects. If true, then in trying to bolster that law, she unwittingly set in motion events that finally allowed its constitutionality to be challenged.

## 9. Roberts's Court

The furor surrounding the Snowden leaks also caused people to take a closer look at the FISA Court and its role in blessing the bulk phone records program under a secret and counterintuitive interpretation of the law. The events raised the question of whether the FISA Court remained a credible institution now that it had taken on a role for which it was not designed: engaging in complex legal analysis, developing a secret body of law, and regulating and overseeing NSA surveillance activities at a programmatic level.

Normal courts, when interpreting what the law means or reviewing an agency's actions, rely on an adversarial process. There are lawyers on both sides who critique each other's arguments, and the losing side can file an appeal. But the FISA Court, because Congress designed it only to review routine wiretap applications, does not have the benefit of this clash of ideas. It hears secret arguments only from the Justice Department, and when it issues secret rulings giving the government what it wants, there is usually no one to file an appeal.

Normal courts, moreover, are made up of an ideologically diverse array of judges. Republican presidents nominated some of them, and

# EXHIBIT 4

# OFFICE OF LEGAL POLICY



MISSION

The mission of the Office of Legal Policy is to develop and implement the Department's significant policy initiatives, handle special projects that implicate the interests of multiple Department components, coordinate with other interested Department components and other Executive Branch agencies, and serve as the primary policy advisor to the Attorney General and the Deputy Attorney General; it also reviews and coordinates all regulations promulgated by the Department and all of its components, assists the Attorney General with responsibilities in recommending candidates for federal judgeships, and coordinates the judicial nomination and confirmation process with the White House and the Senate.

OFFICE NEWS

March 31, 2016
Department of Justice Issues Final Rule Extending Religious Liberty Protections to Beneficiaries of Federally-Funded Programs

October 21, 2015
Principal Deputy Assistant Attorney General Elana Tyrangiel Testifies before the House Committee on Oversight and Government Reform, Subcommittee on Information Technology, At a Hearing Entitled "Examining Law Enforcement Use of Cell Phone Tracking Devices"

September 16, 2015
Principal Deputy Assistant Attorney General Elana Tyrangiel Testifies before the Senate Judiciary on Reforming the Electronic Communications Privacy Act

September 3, 2015
Justice Department Announces Enhanced Policy for Use of Cell-Site Simulators

July 2014
Justice Department Announces Proposed Amendment to Americans with Disabilities Act Regulations to Expand Access to Movie Theaters for Individuals with Hearing and Vision Disabilities

June 2014
One Year After Supreme Court's Historic Windsor Decision, Attorney General Holder Issues Report Outlining Obama Administration's Work to Extend Federal Benefits to Same-sex Married Couples

# EXHIBIT 5

Additional Prehearing Questions
For
John Carlin
Upon his nomination to be
Assistant Attorney General for National Security
Department of Justice

*Keeping the Intelligence Committee Fully and Currently Informed*

**QUESTION 1:** Section 502 of the *National Security Act of 1947* provides that the obligation to keep the congressional intelligence committees fully and currently informed of all intelligence activities applies not only to the Director of National Intelligence (DNI) but to the heads of all departments, agencies, and other entities of the United States Government involved in intelligence activities. Section 503 establishes a similar requirement concerning covert actions. Sections 502(a)(2) and 503(b)(2) provide that these officials shall furnish to the congressional intelligence committees any information or material concerning intelligence activities or covert actions, including the legal basis for them, that is requested by either of the committees in order to carry out its legislative or oversight responsibilities. 28 C.F.R. § 0.72(a) provides that the Assistant Attorney General for National Security (AAG/NS) shall conduct, handle, or supervise the briefing of Congress, as appropriate, on matters relating to the national security activities of the United States.

a. What is your understanding of the obligation of the Attorney General and the Director of the Federal Bureau of Investigation (FBI) to keep the congressional intelligence committees, including all their Members, fully and currently informed?

**Answer:** Section 502 of the National Security Act of 1947 imposes an obligation on the Director of National Intelligence and the heads of all agencies involved in intelligence activities to keep the congressional intelligence committees "fully and currently informed of all intelligence activities . . . including any significant anticipated intelligence activity and any significant intelligence failure." The Act also provides that this responsibility be exercised "to the extent consistent with due regard for the protection from unauthorized disclosure of classified information relating to sensitive intelligence sources and methods or other exceptionally sensitive matters." These obligations apply to intelligence activities undertaken by the FBI and DEA components that are part of the Intelligence Community.

b. To what components of the Department of Justice, including the FBI, does this obligation apply?

**Answer:** The FBI and DEA have obligations to keep the congressional intelligence committees fully and currently informed about their intelligence activities, as set forth in Section 502 of the National Security Act. These pertain to certain activities of the FBI's National Security Branch and the Drug Enforcement Administration (DEA)'s

**Answer:** NSD has the responsibility to ensure that the Department's representations in court are accurate, and to do its utmost to ensure that the same is true of representations made by the Intelligence Community in matters handled by NSD. To fulfill this responsibility, NSD attorneys must work diligently to understand the facts of intelligence activities and other national security-related matters that may be at issue in litigation or other matters for which they are responsible. Our lawyers are officers of the court, and with that role comes the responsibility to ensure that their representations are accurate—and, if any mistakes are made, that they are corrected promptly.

**QUESTION 8:** In October 2013, federal prosecutors informed a criminal defendant that they intended to offer into evidence "information obtained or derived from" intelligence collected pursuant to Section 702 of FISA. In November 2013, the Attorney General informed the *Washington Post* that "[w]e will be examining cases that are in a variety of stages, and we will be, where appropriate, providing defendants with information that they should have so they can make their own determinations about how they want to react to it."

a. Please describe your understanding of the scope of the Department's new policy, including whether it applies to FISA authorities beyond Section 702, and how the Department defines information "obtained or derived from" collection under FISA authorities.

**Answer:** My understanding is that DOJ's practice has always been to provide notice to aggrieved parties when the government intends to use at trial evidence that it understands to be obtained or derived from FISA surveillance. DOJ recently reviewed the particular question of whether and under what circumstances information obtained through surveillance under Title I of FISA or physical search under Title III of FISA could also be considered derived from surveillance under Title VII of FISA (the FISA Amendments Act). The Department has concluded that the term "obtained or derived from" incorporates legal principles similar to those applied under the Fourth Amendment's "fruit of the poisonous tree" doctrine and Title III of the Wiretap Act. The Department has therefore determined that, consistent with practice under the Wiretap Act, information obtained or derived from Title I FISA collection may, in particular cases, also be derived from prior Title VII FISA collection, such that notice concerning both Title I and Title VII should be given in appropriate cases with respect to the same information.

The Department will continue to comply with its legal obligations to notify aggrieved persons of the use of information obtained or derived from an acquisition under the applicable provisions of FISA in judicial or administrative proceedings against such persons.

b. What role has the NSD played in the review described by the Attorney General? Please provide an update on the status of the review.

**Answer:** The Department has publicly stated that it is conducting a review of cases in a variety of stages, and NSD has played an active part in that review. The process associated with that review is still ongoing.

*The Foreign Intelligence Surveillance Act and the Findings and Recommendations of the President's Review Group on Intelligence and Communications Technologies*

**QUESTION 9:** What is your view of the December 12, 2013, report of the President's Review Group on Intelligence and Communications Technologies (the Review Group)? Are there particular principles, findings of fact or analyses of law included in the report that you believe should be highlighted, refuted or clarified?

**Answer:** The Review Group Report, which set out 46 significant recommendations, is one important contribution to the debate over how we can best protect both national security and privacy when conducting intelligence collection activities. The Administration is working to implement the directives announced by the President in his January 17 speech, which are related to many of the group's recommendations.

**QUESTION 10:** What is your view of the specific recommendations made by the Review Group? Please address the Review Group's recommendations related to Section 215 of the PATRIOT Act (Recommendations 1, 5), National Security Letters (Recommendations 2, 3, 7, 8, 9, 10), bulk collection generally (Recommendations 4, 6, 35), transparency (Recommendations 7, 10, 11), non-disclosure orders (Recommendations 8, 9), Section 702 of the Foreign Intelligence Surveillance Act (FISA) (Recommendation 12), surveillance and privacy generally (Recommendation 13, 14, 26, 27, 28, 36), emergency authorities for NSA (Recommendation 15), and cybersecurity measures, to the extent they relate to legal authorities (Recommendation 30, 31, 33, 34).

**Answer:** The 28 recommendations of the Review Group to which this question refers raise a number of difficult and complex issues. As the President announced in his January 17 speech, the Administration plans to end the 215 program as it currently exists, while working on alternatives that will preserve the valuable capabilities it provides. In addition, to implement President's directives, the Administration is currently working to: ensure that nondisclosure for National Security Letters does not last indefinitely; increase transparency through the declassification of FISC opinions; allow private companies to disclose more information than ever before about the orders they receive; and look for opportunities to revise our procedures regarding the government's ability to retain, search, and use in criminal cases U.S. person information incidentally collected when targeting non-U.S. persons overseas under Section 702. If confirmed, I will continue working on all of these efforts, which aim to, as the President said in January, "protect ourselves and sustain our leadership in the world, while upholding the civil liberties and privacy protections that our ideals and our Constitution require."

**QUESTION 11:** 28 C.F.R. § 0.72(6) provides that the Assistant Attorney General for National Security shall administer the FISA. Based on your experiences within the NSD,

# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN IMMIGRATION COUNCIL, | ) |
| **Plaintiff** | ) |
| | ) |
| v. | )     **Civil Action No. 11- 1971 (JEB)** |
| | ) |
| UNITED STATES DEPARTMENT OF | ) |
| HOMELAND SECURITY, et al., | ) |
| **Defendants** | ) |

**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

Defendants, United States Department of Homeland Security (DHS) and the United States Citizenship and Immigration Services (USCIS), by and through undersigned counsel, respectfully file this reply memorandum in response to Plaintiff's Opposition to Defendants' Motion to Dismiss and for Summary Judgment (Pltf's Opp.). Plaintiff's claims for declaratory and injunctive relief with respect to the documents released to Plaintiff as well as Plaintiff's claims based upon a violation of the Administrative Procedure Act (APA) should be dismissed for lack of subject matter jurisdiction.[1] Defendants should be granted summary judgment on Plaintiff's remaining claims because Defendants properly submitted declarations and a Vaughn Index, conducted an adequate search, and complied with the Freedom of Information Act's segregability requirements. In addition, Defendants properly applied FOIA Exemptions 5 and 6 to the withheld information.

**I. ARGUMENT**

**A. AIC's Claim for Injunctive and Declaratory Relief Should Be Dismissed with Respect to the Documents Released to Plaintiff.**

Plaintiff seeks injunctive and declaratory relief for USCIS's failure to provide its FOIA

---

[1] Plaintiff has "agree[d] to withdraw its APA claim." Pltf's Opp. at 2 n.1.

### 2. Attorney Work-Product Privilege

Plaintiff contends that the attorney work-product privilege is inapplicable to Document #1, the PowerPoint presentations. Plaintiff states that the presentations merely "serve as an instructional tool to teach USCIS adjudicators ... about 'internal practices, techniques and procedures used ... during administrative hearings ...." Pltf's Opp. at 26. However, the PowerPoint presentations were "generated by the Office of Chief Counsel to provide internal agency training on the interaction with private attorneys and representatives." Defs' Mtn, Ex. H at 106.  The release of the presentations would "disclose substantial internal practices techniques, and procedures used by the Agency ...." Id. at 106. They contain legal opinions on the development of USCIS policy and procedures for administrative hearings in which an individual appears with or without a representative.  Because individuals seeking benefits from USCIS often appeal adverse rulings to federal court, the[] procedures taught in these PowerPoint presentations were prepared in anticipation of litigation.  Indeed, as this Court has stated, "administrative litigation certainly can beget court litigation and may in many circumstances be expected to do so." Exxon Corp. v. Dep't of Energy, 585 F. Supp. 690, 700 (D.D.C.1983). Moreover, the litigation which is anticipated need not be imminent, as long as the motivating factor behind the creation of the document was to aid in possible future litigation. U.S. v. Davis, 636 F.2d 1028, 1040 (5th Cir. 1981); A. Michael's Piano, 18 F.3d. at 146; Hickman v. Taylor, 329 U.S. 495, 511 (1947). Therefore, these internal presentations were properly withheld under the attorney work-product privilege of Exemption 5.

Plaintiff also argues that Document #2, the Refugee Representation Memorandum, dated November 9, 1992, should not be protected by the attorney-work product privilege. Plaintiff

states that this document is merely "the agency's view of the law ...." Pltf's Opp. at 27. However, this document provides legal advice, from INS counsel, to the agency in contemplation of contested administrative hearings "regarding when a person, applying abroad for admission to the United States as a refugee is entitled to representation at the hearing to determine the applicant's admissibility." Defs' Mtn, Ex. H at 2. As indicated in the Vaughn Index, the disclosure of this information "would disclose substantial internal practices, techniques, and procedures used by the Agency during administrative hearings."  For the attorney work product privilege to apply, the litigation at issue need not be judicial, rather, courts have found that the attorney work-product privilege extends to documents prepared in anticipation of administrative litigation. See Exxon Corp., 585 F.Supp. at 700. Moreover, the litigation which is anticipated need not imminent, as long as the motivating factor behind the creation of the document was to aid in possible future litigation. Davis, 636 F. 2d at 1040.  Therefore, this document was properly withheld pursuant to the attorney work-product privilege.

Plaintiff also contends that the attorney work-product privilege does not apply to Document #s 3, 7, 9, 10, 11 and 12 because Defendant did not show that these documents were prepared because of the prospect of litigation. See Pltf's Opp. at 25. However, the documents appropriately were withheld.  "Any part of [a document] prepared in anticipation of litigation, not just the portions concerning opinions, legal theories, and the like, is protected by the work product doctrine and falls under Exemption 5." Judicial Watch, Inc. v. DOJ, 432 F.3d 366, 369 (D.C. Cir. 2005). Specifically, Document #s 3, 7, 9 and 12 concern the processes and procedures for attorneys to follow when they are representing the interests of USCIS in administrative hearings. See Defs' Mtn., Ex. H. at 77, 98, 99, 102, 104, 117-18; Am. Vaughn Index at 70, 80-

83, 90.   Document #10's emails were properly withheld under the attorney work product privilege because they contained information that is often the subject of USCIS' administrative litigation and how its attorneys are to handle that litigation.   Document #11 contains emails "between USCIS staff and attorneys re[garding] a situation that occurred during and AILA meeting."  Defs' Mtn, Ex. H at 118.   These emails were withheld under the attorney work-product privilege because, through discussion of the incident, the emails offered internal guidance to the recipients about how to handle such incidents in the future.   Therefore, as established in the Vaughn Index and the Amended Vaughn Index, the above documents were properly withheld under the attorney work-product privilege, and the assertion of Exemption 5 should be withheld.[13]

### 3.  Attorney Client Privilege

Defendants have asserted the attorney client privilege to protect Document #s 1 and 2. Plaintiff, however, contends that the privilege is not applicable to these documents because Defendants have not shown that the communications "rest on confidential information obtained from the client." Pltf's Opp. at 28 (citation omitted).   In addition, Plaintiff argues that Defendants cannot show that the confidentiality of the communication at issue has been maintained."   Id. However, Document #1, the PowerPoint Presentations, were prepared by the Office of Chief Counsel for the use of USCIS attorneys and staff.    Therefore, they are attorney-client communications.  This is because the attorney client privilege "protects confidential communications made between clients and their attorneys when the communications are for the purpose of securing legal advice or services." See In re Sealed Case, 737 F.2d 94, 98 99 (D.C.

---

[13] Even if these documents were not properly withheld pursuant to the Attorney Work-Product Privilege, they were properly withheld pursuant to the Deliberative Process Privilege of Exemption 5.